The next case will be L05-1387. Ben is live at Hitachi LTD. Mr. Cody? Yes. I forgot we were standing here. I'm sorry. May I, too, support Jim Miloland for appellants? I appreciate the opportunity to appear before you today to remedy an egregious circumstance in which an $86 million infringement verdict was entered against appellants. Six months after the Board of Patent Appeals, I unanimously decided that there were no patentable claims. Now, let's not get into characterizations. It may or may not be egregious. Why don't we go from there to the case? Yes, sir. We believe that the patent in suit is void of ab initio, as indicated by the sitting of the Board of Patent Appeals. As this court has previously found in, for example, the case Ethicon v. Quig, reexamination should continue even while a lawsuit is pending because the court can learn from what happens in the reexam. The litigation could be simplified if claims are canceled, meaning, of course, that once a claim is canceled, it should no longer be capable of being asserted in litigation. That is precisely what happened here. Before the first trial ever in this case, the examiner already had finally rejected all claims. That was in 2003. The validity trial had not yet occurred in this case. So all claims stood rejected at the time that the trial proceeded. The district court made the decision to not stay in this case, perhaps not following, necessarily, the best practice. The best practice might have been the one with the court. Is that a decision completely within their discretion? Yes, that's right, Your Honor. It is in the court's discretion. Now, in Inland Steel, for example, the court did it differently. There had already been an infringement jury verdict, but that patent was also going through reexam. All the claims were rejected in reexam. And then the district court dismissed the case without prejudice until this court had had an opportunity to rule on the claims. What did the district court say when it decided not to abide by the same rule? In this section, Your Honor, the court said on our motion for reconsideration and rehearing, after the board's unanimous decision, that the district court looked at the claim construction. But you said before the trial began, it had to be examined again. Yes, that's correct. It had to be reexamined. Before the trial was bifurcated, in this case. No, no, that's correct. I'm asking what did the court say when it looked forward in the face of the examiner's action? The court decided to stay. And- What did he say? He did not allow any evidence of the reexam. Did he say anything about why he was doing it? He did not do it. It was just- We'd like to put it to the judge for action. He didn't have any confidence in this exercise. I don't want to read it. He was wanted out for three years, five times. The board mercilessly decided to place Brett Rett. It was something like five or six months. It was premeditable. This process took an awful lot of time. The process did take a long time, Your Honor, although it's important to note that the fourth reexam was initiated by Translogic itself. And then, of course, Translogic appealed from the result of the third reexam and appealed again as a result of the fifth reexam. So the length of time was partly in the control of the patentee. But the district court decided without specific- On that point, I'm wondering about this argument you're making, that the court probably should wait and get the benefit of the standards and attack the officers' processes when they don't look very professional. I mean, there's a presumption of regularity, and presumption of expertise we know isn't necessarily true. And, you know, maybe the better record is made in the court. I don't mean to suggest that it was an abuse of discretion to go forward with the case. I do acknowledge that the district court had that opportunity. But I do say that the evidence of what was going on in the reexam is part of the file history that needs to be considered by the court. And the problem with proceeding simultaneously when the reexams are pending is that the file history is continuing to evolve. So here in this case, the file history was evolving. The translogic made an admission in the reexam that signals are not part of the claims, that it's only claiming the multiplexer survey. And with those admissions and with the decision of the board, it then would have been incumbent on the district court to perhaps reconsider its claim construction. Well, let's assume there was no abuse of discretion. It's just pro-success. Yes. And now you have a judgment. You have an article of plea court. Yes. And it's a judgment. You have a jury that has made findings. You've got Article III of the Constitution. You've got the 7th Amendment about questioning the jury's findings in another forum. Isn't that a problem? Well, I'll start at the end. The 7th Amendment is not a problem because the courts have consistently ruled that a pact is not a property right. It is a right granted by the United States government to exclude for a certain amount of time. And if the government concludes that it made an error in granting that patent, then there's not a constitutional right that's being implemented here. The government is the one who has decided that it has that right to exclude. And through the reexamination, doing what it was supposed to do, the government decided that it had made a mistake. Now, here we have a judgment that was subsequently entered after the government had already said we made a mistake in issuing this patent. And the district court said at that point, here's my claim of construction. Here's the court's claim of construction. It's up to the Federal Circuit to reconcile what's going on. And that's why we're here. We believe that the board's claim of construction was the correct one and that the district court prepared its claim of construction. That, of course, is reviewed in OVO here. And we do think that this was a claim on a structure, a multiplexed structure, and that the signals are not part of the structure. Consequently, the claim of construction coupled to receive, meaning capable of receiving, is the appropriate one and should have been adopted in the district court as well. If one does that, then, as Mr. Lamarcus said, the Garai part anticipates as does JP219. In addition, the board also pointed out that intermediate outputs should have been ignored in the construction. I'm not wrong that, in my recollection, that the discussion has to at least go to those where it seems to have been motivated by looking at the intended use of the structure. Is that what you let the district court to its conclusion? Our belief is that the trans-labs was characterizing its invention in terms of the intended use, absolutely. And one can claim that way. But if we do, as mentioned earlier, then any art that can perform the same function anticipates or invalidates. And that's what's happened here. This is a structure, described as a multiplexer circuit, for the purpose of the multiplexers being a multiplexer circuit. And any structure then, such as Garai, such as Tossler, such as the carry chain art, that also invalidates. And if I may, I have a little remark here. This is a silly example of what I call the serial tennis tournament championship round. Imagine that there were a computer system that was tracking the results of this serial tennis tournament, player A and player B. As a result of the outcome of the match, the circuit says, move on player A, let's say, to stage 2. Now, it also may send a signal which says, and pay a check of $50,000 to that player, but it has selected between one of the two inputs. Then we go to the next stage, player A versus player C. As a result of the outcome of the match, the computer system advances to player C. It also sends another signal saying, pay him or her $100,000. And then, finally, in the third stage, the final outcome is decided. Now, the definition of multiplexer is that the ultimate result of the circuit is that one of the four inputs is selected. A or B or C or D. One of the inputs is selected. That's the structure. This is the multiplexer structure. Then it also sends other signals out. That does not change the structure. And it does not make, it means that any arc that had the same structure would invalidate. And, for example, the club shot arc, Do you have a mic around here? I'm sorry, I didn't. Pardon me. You want to make sure it gets recorded. Thank you. He says it's okay. The coach says it's okay. I'm sorry, what was that, sir? Is this better? You can hear him. All right. Don't worry about it. The club shot arc does exactly the same thing. That's just figure five. It has four inputs. Here they are. P, N, G, I. G, I, plus one bar. G, I, plus two. It has four inputs. It has three control signals. Here they are. P, I. P, I, plus one. P, I, plus two. And it has one output. So it's selected from the four inputs, one output. It's multiplexing. Oh, it's also doing some other things. It's also sending these signals out. Maybe those signals say, pay $50,000, pay $100,000. But it's still serving a function of a multiplexer, the use of a multiplexer. And the translogics expert admitted that. You testified with respect to a closure of figure five that C out selects as N output, as N output, one of the four input barriers. Did you not? Yes. So, Your Honor, to your point, if the claim is for the use as a multiplexer, then other circuits that multiplex invalidate. And we believe that that was the fundamental error that the district court made in the claim construction, not recognizing that it was a circuit structure that was being claimed. If the court adopts a claim construction that we urge that this is a structure, then the GRI art, the JP2119, and the carry chain references all invalidate this patent. Of course, this was a jury trial. There were many other issues that came up. I'll briefly touch on them, although it's our hope that the court never needs to reach them. There was a finding of inducement against Hitachi Limited. We submit that under DSU Medical, that decision has to be reversed. There was no evidence of direct infringement here. The only evidence in the record is that Hitachi in Japan sold to Sega in Japan and to Casio in Japan. So there was no evidence of direct infringement. But beyond that, there's definitely no evidence of intent to infringe. And, as indicated in DSU Medical, we urge you to vote on that one. That's pretty well covered in the report. All right. Very well. Then I will say the rest of my time. Thank you very much. This court has commented at times about the difficulty of doing claims construction in the abstract without being able to see infringing devices. To hear Hitachi up here on the field now saying, well, what a surprise, all this structure that we've talked about during the infringement proceedings for months and months, looking at thousands, literally, thousands of pages of their circuit drawings to trace the input terminal couple to receive a signal. Listening to Professor Seachen talking about that very drawing right there, telling the jury, oh, see how each input terminal is coupled to receive a signal. Tracing it out for them. Ghosting out the surrounding circuitry. Telling the jury that, oh, what the surrounding circuitry is doesn't matter as long as it's all coupled to receive, coupled into a different signal source. Telling the jury that the coupled-to-receive language, Professor Seachen telling them this, the coupled-to-receive language, it's like a cord on a lamp plugged into a socket. That's what the coupling is. Everyone who knows, who has practical experience in circuit diagrams, knows what an input terminal coupled-to-receive a signal is. That's why Itachi produced all these drawings. Made everyone look at them. We traced it, and we found some errors. Four out of hundreds, but still, some errors, which we omitted, where the input terminals were, as I said, connected together to receive to the same input, signal input source. The court's claim construction was based on far more understanding of what input terminal coupled-to-receive various signals means. I would also like to direct the court's attention to Hitachi's patent. Their 202 patent was in evidence. It's in the volume one of the massive appendix of A2387. It's column 11 of their 202 patent. There, Itachi talks about it, and it's the best statement I've ever seen about the different types of input terminal connections. It's like for DNA, somebody explaining what the A, the C, the G, the T are, and how they interact. It says, in other words, the formal application of inputs include one, to connect to the power supply line, two, to connect to the ground line, three, to connect to the same signal as the signal to be applied to the other input terminals, four, to connect to a complementary signal, or five, to connect to an independent signal which does not fall in the cases described above. We claim five. Hitachi knew it. That's why we had these summary judgment proceedings where everybody was figuring that out. The patent's great, the 202 patent, because it's got drawings just like the one that I showed you in Westy that literally show the connections to power supply lines, literally show you connections to the same signal sources. What is the consideration of GORI? What is the consideration of GORI in this record? GORI, the case was tried to a jury with respect to GORI, and the jury found in Translogic's favor. And so what was presented to the jury on GORI? Well, and I'll jump to that because there's a point there that's important with respect to Hitachi's reply. At trial, Hitachi presented to the jury one theory and one theory only on GORI. It was more or less what you were saying a little bit ago. That the GORI picture looks identical. It's got different symbols just like patent figure three has different symbols. Therefore, it must be connected to receive all different variables just like the patent claims. There's spot-on identical input terminal connections. And to our Translogic's testimony, Professor Wilde and others, that no, if you read GORI, that's where the point came in. Professor Wilde, you know, we read the article and just look at the pictures, you'll see that GORI defines the H's and the GP in a way that's different than the patent defines I0, I1, and so forth. So that it can be a variety of things. And so it's not disclosed in connection to all the different signals. And so, and Professor Seaton's testimony and Hitachi's position was just adamant that no, those definitions of G and of H in GORI do not apply to figure three. Nobody believes that. The jury didn't believe it. The board doesn't agree with that. Professor Wilde didn't agree with that. But that was their story and they stuck to it even in their opening brief to this court. If you look at the opening brief in this court, they don't address genus-species arguments. They don't address the notion that figure three can be connected in hundreds, many, many, many ways as someone just said here. No, they stick with their magic bullet theory. That GORI figure three has only one set of connections and it's to all independent variables. And in the reply brief they change. In the reply brief at pages 18 through 20, I'm picking one of the footnotes there, finally they make the obvious concessions. That if you read GORI, it defines the H's so that they can be either connected to a constant zero or a constant one for a variable. And the variable can be the same variable that's received by one of the other input terminals. And what that means to people still in the yard, if you've got two terminals receiving the same variable, those two terminals are structurally connected together. Just as in the board's drawing of Tosser, where the Tosser figure will show only the names of the two symbols. But even when the board draws it, it draws it as that means the two input terminals are connected together. That's a structural distinction. So Hitachi has abandoned, on appeal, the only GORI argument they presented to the district court by for the first time conceding in the reply brief that each of the H's and GP can be connected to a constant. It can be a constant, for example, or it can receive a shared signal. For me, that's huge. I mean, that's the case we tried. It was a lot of time. What was the issue on GORI? Professor Wilde and others then testified that because GORI does not show a 4 to 1 multiplexer, contrary to Professor Seaton's testimony. And therefore, it doesn't anticipate with respect to those limitations. And then also, he testified it doesn't make it obvious. And among the reasons it doesn't make it obvious is 4 to 1 multiplexers were well-known. In fact, the best evidence is oftentimes Hitachi's evidence. And among their evidence was Professor Seaton's testimony. He scoured the earth finding all the cell libraries in existence at the time. He found 11 of them. And his point is to show, oh, they all have 2 to 1 multiplexers using TPN. Yeah. And all the ones in evidence show 4 to 1 multiplexers too. And every one is the prior art 4 to 1 multiplexer. Every one. Those things have been around for decades. People said, nobody thought about doing 4 to 1 multiplexers the way Joseph Tron invented it until he came up with his patent. Hitachi's been making chips forever. In the record, they have evidence of all the chips they made before the patent that don't infringe. And they couldn't come up with a single instance where they used this circuit prior to the patent. And yet, every SH4, which is their high-end chip, every SH4 had Mr. Tron's circuit in it. What's the evidence that is not obvious? I mean, that's overwhelmingly powerful evidence. It was put to the jury at the beginning of the trial by me. If it's so obvious, why didn't they do it? Let's hear what they had to say about that. They had nothing to say about that. Also, going back to this Dorai point, though, and to Hitachi's little switch in time here, they said to the jury, both through Professor Seaton and through Mr. Lane, their trial attorney, in closing, that none of the other Dorai references anticipated. They admitted it. They said they're different. Mr. Lane, in closing, said, oh, you know, Mr. Love's talking about all these other figures later on in the article. But we're just basing it on figure 3. He said 6 and 8 and 9 and 10 are different. Agreed, he said, agreed to that jury. They said, but so what? Figure 3. Now look at their reply to it. For the first time, they're saying, look at figure 9. All of these things they anticipate, they're all the same. What's with that? That's unbelievable. We've got it in our opening briefs, the citations, where they said that 6, 8, 9, and 10 do not anticipate, because their input terminals are connected to its constants, and their input terminals are connected to receive the same signal. They can't switch like that. But their switch is also telling us how vague their whole case was at trial. You know, based on it. I want to address the intermediate output issue. Hitachi got summary judgments on the first chip he accused based on intermediate outputs. The jury was told that at trial by Mr. Tron in his testimony, because Hitachi had opened the door to that whole thing. You know, why on earth would a jury find that that circuit is identical to the claims, like Hitachi's claiming, when Hitachi got summary judgment on that very same circuit, which was in the first chip that we accused. We thought it didn't have five intermediate outputs connected to the surrounding circuitry. That's why we accused it. We made no bones about that with the trial court. We said, we just need discovery on the point. Hitachi moved for summary judgment before the validity trial. They said, before claim construction, but they said, just construe one thing, that the claims don't allow intermediate outputs. Because, you know, the patent team made that clear in re-exam. And we agreed. The patent does not allow intermediate outputs. We agreed. And this is what we didn't know. And this is when there was only one chip in the case. They made that motion. Because if they thought they could knock out that chip, they'd win the whole case. And so we did our discovery. We trans-argued it was wrong. And we admitted it, that it did have intermediate outputs. They got their summary judgment. That's in the final judgment. They never retracted it. And they requested a jury instruction that said, no intermediate outputs. The only reason it's watered down a little bit is because we wanted it watered down in case we found circuits that had intermediate outputs that weren't connected and just did appendages. That was a mistake on our part. I mean, we could find something like that. We never accused them, though. It wasn't worth the hassle. Because by that time, the mother load had come in. And we found all the infringers. But, you know, at trial, this court, the case was tried under instructions that they requested that allowed the jury to find a circuit like that. Doesn't anticipate it's got the intermediate outputs. Because it's a four to three circuit. It's not a four to one circuit. With respect to inducements, I want to make it clear that he says that that's an issue with respect to Hitachi Limited. That's an issue with respect to Hitachi Limited only. So there's two other defendants. We don't want to launch into that. Because I'd probably leave it on the briefs. OK. The only other issues. Well, of course, the main issue is that they abandoned all their claim construction arguments that they're making on appeal. I mean, they're wrong, too. But they came up with this new claim construction. After two trials, after all the summary judgment proceedings, they can't do that. They can't raise on appeal brand new issues that they never raised during jury instructions or during J-law motions during trial, during Markman proceedings. And so they're stuck with the claim construction they requested. And that's fair. And what they requested was a couple of two means connected to it. And repeatedly, throughout various proceedings, they knew that that meant that each of the infant terminals had to be connected to an independent variable signal source. Indeed, that was their only objection to the injunction. That it's not clear enough with respect to those infant terminal connections that they have to be connected to independent signal sources. Now, look at the injunction. That spells out exactly what the claims mean. They didn't object otherwise to the formal injunction, that it means no infant terminal can be coupled to ground. No two infant terminals can be connected to the same signal source. There's the issue about whether the Hitachi can prevail. Well, obviously, the Hitachi has basically adjunct its trial, all its theories of trial. Instead, it's just banking on the re-exam, saving the day. But it should, certainly not if the judgment is affirmed from the trial court. You can't have an agency. An agency decision isn't going to change the jury verdict or a judgment based on it. Principles of finality, principles of respect for juries come into play. The Seventh Amendment comes into play. These are critically important issues. If Hitachi feels that there's some ground for changing the judgment, it should bring its motion in the first instance in the trial court under Rule 60. There are rules to deal with events that happen post-verdict or post-judgment that, in all fairness, ought to affect a judgment or an injunction. And so they can file their motion in the first instance in the district court under those standard rules. If they want to argue that collateral estoppel applies, they never played collateral estoppel. These are issues that aren't right. That's why they only got a paragraph of briefing, basically. It's something that, if this court ever just decided each case on the merits, if there's an issue about how they interact, that's an issue that ought to be dealt with at the trial court level in the first instance. Thank you. Thank you. Thank you, Your Honor. Counsel says that Hitachi should have brought a motion to amend the judgment under Rule 60. But I would suggest that Hitachi did everything that it could in the circumstances of this case by filing a motion for reconsideration and a motion to re-examine. After the board's decision was rendered, but before final judgment was entered in this case, there was a six-month time period in which we did ask the court to reconsider. The problem with having a re-exam, and the trial went on simultaneously, is that the file history is constantly changing. And the file history is what this, or the intrinsic record that must be consulted for claim construction. Consequently, when the file history was finished, when the board's unanimous decision was rendered, we asked the district court to reconsider its claim construction. But it declined to do so and left that to this court. Throughout the trial, Hitachi's position was consistent, that what was being claimed here was a structure. The phrase, cumulative, which was the one that was construed in the validity trial, is different from the phrase, couple to receive. Those are different claim terms. They receive different constructions. And the infinitive to receive is talking about the capability of the structure. There's an intended use for the structure, receiving signals. There is nothing in the claims which says that the signals need to be independent. There's nothing in there at all. Translogic is trying to import limitations into the claims that are not in the specification. In the district court, Translogic said, in its brief after the infringement trial, quote, the patent claims a structure, not a method of operation. It went further in the brief to say that the circuit does not even have to be plugged in to infringe. It said it infringes as soon as the vote arrives from Japan. So clearly, the signals and the sources of the signals and all of those things are outside the scope of these claims. And therefore, anything having the same structure invalidates. Nor did we waive the argument on intermediate outputs. Before there was ever anything in construction, in the re-exam, Translogic said that the multiplexer circuit only has a single output with no intermediate outputs branching off. It then, because it made that concession, withdrew its opposition. But then the court picked a different claim construction. Thank you very much.